AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
214 Miami Lakes Drive, Milford, Ohio

Case No. **1:26-mj-00737**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Southern District of Ohio, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement |
| 18 U.S.C. § 2423(b) | Travel with Intent to Engage in Illicit Sexual Conduct |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Jacqueline W. Scott
*Applicant's signature*

Jacqueline Scott, Special Agent FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime video conference *(specify reliable electronic means)*.

Date: 09/10/2026

Stephanie K Bowman
*Judge's signature*

City and state: Cincinnati, Ohio

Stephanie K. Bowman, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

The property to be searched is 214 Miami Lakes Drive, Milford, Ohio 45150 (the "PREMISES.") The PREMISES is an approximately 1,841 square feet condominium with 2 bedrooms and 2 bathrooms. The PREMISES is the end unit of a row of 5 condominiums with "214" affixed to the front of the 2-car garage. The following images were obtained through the property search function of the Clermont County (Ohio) Auditor's website[1].



Photo source: Website of the Clermont County Auditor[2], date 11/09/2018

[1] https://www.clermontauditorrealestate.org/_web/search/commonsearch.aspx?mode=owner

[2] https://www.clermontauditorrealestate.org/_web/idoc2/photoview.aspx?sIndex=0&idx=1&LMparent=944



Photo source: Website of the Clermont County Auditor[3], Date 03/19/2024

[3] https://www.clermontauditorrealestate.org/_web/maps/cyclomedia.aspx?sIndex=0&idx=1&LMparent=944




Photo source: Website of the Clermont County Auditor [4], date 03/19/2026

[4] https://www.clermontauditorrealestate.org/_web/pictometry/pictometryipa.aspx?sIndex=0&idx=1&LMparent=944

# ATTACHMENT B

## Property to Be Seized

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, relating to violations of 18 U.S.C. § 2422(b) (Coercion and Enticement and Attempted Coercion and Enticement) and 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct), occurring between 1990 and 2008 (the "TARGET OFFENSES"), that have been committed by JEFFREY TURNER TAYLOR (the "SUBJECT") as described in the search warrant affidavit, including, but not limited to:

a. Evidence of the TARGET OFFENSES;

b. Communications between SUBJECT and minors (other than his children), in particular, minors to whom SUBJECT discipled, ministered to, and mentored between 1990 and 2008;

c. Evidence of any planning or preparation to commit those offenses;

d. Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

e. Evidence of the state of mind of SUBJECT, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

2. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of potential victims and witnesses of violations of the TARGET OFFENSES.

3. The passport of the SUBJECT.

4. Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES.

5. Mementos of the TARGET OFFENSES, including but not limited to minor boys' underwear and underwear waistbands; mementos, souvenirs, and keepsakes from travel with children, mission trips, and church retreats.

6. Records and information—including but not limited to photographs, calendars, journals, itineraries, receipts, and financial statements—relating to the SUBJECT's coercion and enticement of minors and/or travel with the intent to engage in illicit sexual conduct with minors. This includes but is not limited to:

a. Photographs, in particular photographs of minor boys not his children, photographs of SUBJECT with minor boys not his children, and photographs the SUBJECT showed to victims as described in the affidavit;

b. Photographs of mission trips, church retreats, and day or overnight trips the SUBJECT traveled to between 1990-2008;

c. Journals or diaries maintained by the SUBJECT between 1990-2008;

d. Calendars, electronic calendars, or datebooks maintained by the SUBJECT and/or concerning the SUBJECT's whereabouts and daily meetings between approximately 1990 and 2008;

e. The professional resume or curriculum vitae of the SUBJECT showing professional entries from 1990 until 2008;

f. Electronic removable media which may contain materials sought in this paragraph, including electronic copies of itineraries, receipts, financial statements, photographs and/or videos contained on storage media such as VHSs, CDs, DVDs, Floppy Discs, USB Drives, and external hard drives;

g. Computers that may be used as a means to store the materials described above.

7. For any computer and/or storage medium whose seizure is otherwise authorized by this warrant, and any computer and/or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e. evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

8. This warrant authorizes temporary seizure of all papers, documents, photographs, electronic removable media at the PREMISES for further review at Federal Bureau of Investigation Field Office(s). Government personnel assisting in the investigation will promptly review these materials for assessment of seizure pursuant to ATTACHMENT B. All materials not responsive and included in ATTACHMENT B will be returned to the PREMISES within 7 calendar days.

9. Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices, within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a

complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

10. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the investigation.

11. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

12. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

13. If the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e. communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. This investigation is presently covert and the government believes that the subject of the search is not aware of this warrant.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 214 MIAMI LAKES DRIVE, MILFORD, OHIO 45150 | **Case No. 1:26-mj-00737**<br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Jacqueline Scott, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **214 Miami Lakes Drive, Milford, Ohio 45150** (the "PREMISES"), further described in Attachment A for the things described in Attachment B. Attachments A and B are incorporated into this affidavit by reference.

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 U.S.C. § 2516. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2242, 2243, 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since December 2022, and I am currently assigned to the Washington Field Office Child Exploitation and Human Trafficking Task Force. I am a graduate of the FBI Academy

in Quantico, Virginia, where I received extensive training in federal law and various investigative methods. I hold a Bachelor of Arts and Doctor of Jurisprudence and am a licensed attorney in the state of Pennsylvania.

3. While employed by FBI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography, including but not limited to offenses related to coercion and enticement of minors and the illegal possession, receipt, distribution, advertisement, and production of material depicting the sexual exploitation of minors. As a Special Agent with the FBI, I received training on investigative techniques related to crimes involving the sexual exploitation of children, including obtaining and analyzing digital records, analyzing stored digital media, and the application for and execution of search and arrest warrants. I have conducted and assisted in federal child exploitation investigations and participated in the execution of numerous search warrants in support of child exploitation investigations. Through my life experience and professional experience, which includes the execution of fifty to a hundred residential search warrants, I know it is common for individuals to keep in their homes personal memorabilia collected throughout a lifetime, including items such as journals, calendars, datebooks, photographs, photo albums, CDs, DVDs, scrapbooks, receipts, tickets, event programs, etc.

4. I have gained additional experience in child exploitation investigations through training, discussions with other law enforcement officers and computer forensic examiners, and everyday work conducting these types of investigations. Through this experience, I have learned that many individuals who sexually abuse children engage in a grooming process of those children to reduce resistance to sexual advances. This process can include isolating the child, gift-giving, solicitation of secrets and/or secret-keeping, and other behaviors designed to desensitize the child

to sexual topics or advances. This grooming process is often elongated. In my training and experience, the grooming process is often a reward in-and-of-itself, and sexual abusers maintain mementos and tangible pieces of the memories of the process.

5. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts or notes interviews, which are subject to further revision.

6. Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations or attempted violations of 18 U.S.C. § 2422(b) (Coercion and Enticement) and 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct) ("SUBJECT OFFENSES") have been committed by JEFFREY TURNER TAYLOR. I submit there is probable cause to search the PREMISES described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

*Overview*

8. Jeffrey Turner Taylor, date of birth 04/06/1960, (hereinafter, "TAYLOR" or "SUBJECT") served as the youth minister at The Falls Church (hereinafter "TFC"), a large church community in Falls Church, Virginia,[5] from approximately 1990 to 2002. In 2023, the FBI first received information concerning TAYLOR's sexual grooming and possible abuse of children through his position at TFC. In 2024, the FBI Washington Field Office opened an investigation into TAYLOR with the support of the United States Attorney's Office for the Eastern District of Virginia. I am one of the assigned investigators and have been since it was opened.

9. The investigation, supported by review of available records and numerous interviews of then-children, parents, co-workers, and other associates of TAYLOR, revealed that TAYLOR sexually groomed multiple boys under the guise of spiritual guidance. TAYLOR's grooming behaviors included inquiries into the sexual secrets and habits of boys, gift-giving, and mentorship. On multiple occasions, as described in further detail below, TAYLOR traveled with the intent to engage in illicit sexual conduct by taking a boy with him to a ministry event in another state or country. On several of these occasions, TAYLOR engaged or attempted to engage in physical sexual abuse of boys. The investigation also revealed that, after TAYLOR left TFC and moved on to another church in Atlanta, TAYLOR groomed a boy in his ministry there and sexually abused the boy on multiple occasions.

10. Of the conduct known to investigators, TAYLOR's sexual grooming and abuse spanned 1990 to 2008.

---

[5] Located in the jurisdiction of the United States District Court for the Eastern District of Virginia

11. Through interviews, including those with a member of TAYLOR's household around the time of the known offenses, investigators have learned that TAYLOR took photographs during ministry trips and events, consistently kept journals, maintained photographs of his youth mentees and ministry events, and maintained a datebook and/or personal calendar. Based on this information, TAYLOR's practices of saving these items, and the enduring quality of the evidence sought, there is probable cause that such items are located at the PREMISES and contain evidence of TAYLOR's criminal conduct.

*Witness Numerical Legend*

12. As this affidavit references statements from multiple witnesses, some of whom are minor victims, a numerical system of identification is outlined here for ease of reference:

a. WITNESS #1 – Born in 1977. Member of TAYLOR's youth ministry at TFC.

b. WITNESS #2 – Born in 1976. Member of TAYLOR's youth ministry at TFC.

c. WITNESS #3 – Born in 1982. Member of TAYLOR's youth ministry at TFC.

d. WITNESS #4 – Born in 1984. Member of TAYLOR's youth ministry at TFC.

e. WITNESS #5 – Born in 1986. Member of TAYLOR's youth ministry at TFC.

f. WITNESS #6 – Father of WITNESS #5.

g. WITNESS #7 – Mother of WITNESS #5.

h. WITNESS #8 – Born in 1991. Member of TAYLOR's youth ministry in Atlanta.

i. WITNESS #9 – Born in 1986. Child of TAYLOR. Member of TAYLOR's household from birth to approximately 2004.

13. In sum, the investigation has revealed there is probable cause TAYLOR committed the following offenses: Coercion and enticement and attempted coercion and enticement of

WITNESS #4 from approximately January 1998–January 2002; Coercion and enticement and attempted coercion and enticement of WITNESS #5 from approximately January 1998–January 2002; Coercion and enticement and attempted coercion and enticement of WITNESS #3 from approximately September 1994–September 2000, all in violation of 18 U.SC. § 2423(b). Additionally, the investigation has revealed there is probable cause TAYLOR traveled in interstate commerce with intent to commit illicit sexual conduct from Virginia to Maryland on one or more occasions from January 1998–January 2002; traveled in interstate commerce with intent to commit illicit sexual conduct from Virginia to Maryland on one or more occasions from January 1998–January 2002; traveled in interstate commerce with intent to commit illicit sexual conduct from Virginia to Illinois from January 1998–June 2000; and traveled in interstate commerce with intent to commit illicit sexual conduct from Virginia to Maryland on one or more occasions from January 1998–January 2002; traveled in interstate and foreign commerce with intent to commit illicit sexual conduct from Virginia to Honduras from June to July 2000, all in violation of 18 U.S.C. 2423(b). In addition, the investigation revealed TAYLOR committed Coercion and enticement and attempted coercion and enticement of WITNESS #1 from approximately September 1990 until 1995 and traveled with the intent to commit illicit sexual conduct with WITNESS #1 from Virginia to Illinois in approximately 1991 or 1992. Further, TAYLOR sexually abused WITNESS #8 from 2004-2008.

*Background on TAYLOR, TFC, and TAYLOR's Ministry*

14. TAYLOR was born in 1960. Prior to moving to Falls Church, Virginia in 1990, TAYLOR worked for several years as a youth minister at Winnetka Bible Church in Winnetka, Illinois.

15. In approximately 1990, TAYLOR was hired by TFC as the full-time director of youth ministry. TAYLOR was in this position until 2000, when he transitioned to a role in family ministry at TFC. In 2002, TAYLOR left TFC for a job in youth ministry at a church in Atlanta, Georgia. Between 1990 and 2002, TAYLOR and his family resided in Falls Church, Virginia. Between 2002 and approximately 2013, TAYLOR lived in Georgia. In approximately 2013, TAYLOR moved to Ohio to reside at the PREMISES.

16. In the 1990s, TAYLOR grew TFC's youth ministry program exponentially. The program, Cornerstone, was designed for students from approximately 6th to 12th grade and included weekly small group meetings, large gatherings on Sunday evenings, and one-on-one mentorship sessions between adult group leaders and students. Small groups were comprised of an adult leader and students of the same age and gender. TAYLOR selected boys to be members of his small group and conducted one-on-one mentorship sessions with boys both in his small group and those he selected from different groups.

17. TAYLOR was described by witnesses, both then-students and adults, as charismatic, energetic, dynamic, and playful. Some referred to him as rockstar with a larger-than-life personality.

18. A 1994 TFC directory included the following photograph of TAYLOR:




19. As relayed by dozens of witnesses who were mentored by TAYLOR, either through a small group setting or one-on-one, sex and masturbation was a primary focus of TAYLOR's mentorship of teenage boys.

*TAYLOR's Conduct with WITNESS #1*

20. WITNESS #1 was born in 1977 and participated in TFC's youth ministry program from approximately 1989 to 1996. Soon after he started at TFC in 1990, TAYLOR sought to spend time alone with WITNESS #1, who was in his small group. TAYLOR took WITNESS #1 on frequent one-on-one mentorship meetings. For the meetings, TAYLOR picked up WITNESS #1 from home or school in his car and they would get a snack or food at a local restaurant or run errands. When they were alone in the car, TAYLOR engaged in horseplay with WITNESS #1, such as light wrestling, and touched or patted WITNESS #1's knee.

21. During these meetings, when they were alone, TAYLOR consistently asked WITNESS #1 about sex and masturbation. TAYLOR inquired, in sum and substance, whether WITNESS #1 masturbated; if he did masturbate, how many times in the last week; what he thought

about when he masturbated; whether he had wet dreams; whether he ever woke up with an erection, and other similar questions.

22. On or around the time when WITNESS #1 was 13 years old, estimated to be approximately 1991, TAYLOR invited WITNESS #1 to a trip to Chicago, where WITNESS #1 understood TAYLOR had a speaking engagement with another youth ministry program. On the last night of the trip, TAYLOR and WITNESS #1 stayed overnight at the home of one of TAYLOR's former parishioners in Winnetka, Illinois and shared a bed. That night, TAYLOR sexually abused WITNESS #1—TAYLOR masturbated WITNESS #1's penis and guided WITNESS #1 to masturbate TAYLOR's penis and perform oral sex on TAYLOR's penis. The next morning, TAYLOR framed what happened the night before as an act of "spiritual warfare" and told WITNESS #1 that neither of them should ever share what happened.

23. TAYLOR continued to mentor WITNESS #1 as he progressed through middle and high school. In approximately 2007, WITNESS #1 first disclosed his experience of sexual abuse by TAYLOR to a confidant. In 2023, WITNESS #1 reported his abuse to the FBI.

*Horseplay with TAYLOR, as recalled by WITNESS #2*

24. Horseplay and rough housing were a common occurrence for boys at TFC's youth ministry. TAYLOR encouraged and participated in horseplay at ministry events, particularly with his small group. WITNESS #2 was born in 1976 and participated in TFC's youth ministry program from approximately 1990 to 1994. WITNESS #2 was part of a small group led by TAYLOR and experienced similar intrusive inquiries by TAYLOR into his masturbation habits during one-on-one meetings. WITNESS #2 shared how the small group would horseplay, wrestle, and rough house with TAYLOR prior to the start of their meetings. A specific part of horseplay was TAYLOR's administration of an "atomic wedgie," in which he would give a boy a wedgie with

such force that the band of the boy's underwear would rip off. WITNESS #2 recalled TAYLOR kept these bands of underwear as a sort of trophy and would hang them in his church office or from the rearview mirror of his car.

*TAYLOR's Conduct with WITNESS #3*

25. WITNESS #3 was born in 1982 and participated in TFC's youth ministry program from approximately 1994 to 2001. TAYLOR sought to spend time alone with WITNESS #3, who was in his small group. TAYLOR took WITNESS #3 on frequent one-on-one mentorship meetings. These meetings were arranged in person or via telephone call and usually took place after school.

26. For the meetings, TAYLOR drove WITNESS #3 in his car and, together, they would get a snack or food at a local restaurant, play sports, and go to parks. When they were alone in the car, TAYLOR engaged in horseplay with WITNESS #3, such as tickling WITNESS #3's knee.

27. During these meetings, when they were alone, TAYLOR consistently asked WITNESS #3 about sex and masturbation. At first, TAYLOR asked WITNESS #3 to share his greatest sin. TAYLOR also asked WITNESS #3 about the size of WITNESS #3's penis. TAYLOR also asked WITNESS #3 if he masturbated, if he had wet dreams, and other similar questions. On one occasion, TAYLOR told WITNESS #3 about a time a man touched TAYLOR's genitalia without his consent. TAYLOR attempted to reenact the act on WITNESS #3 by sliding TAYLOR's hand up the inner thigh of WITNESS #3 toward WITNESS #3's genitalia. Before TAYLOR made contact with genitalia, WITNESS #3 pushed TAYLOR's hand away and got angry at TAYLOR.

28. On one occasion, TAYLOR gifted WITNESS #3 a pair of silk underpants and requested WITNESS #3 not tell his parents about the gift.

*TAYLOR's Conduct with WITNESS #4*

29. WITNESS #4 was born in 1982 and participated in TFC's youth ministry program from approximately 1997 to 2002. TAYLOR took WITNESS #4 on frequent one-on-one mentorship meetings, sometimes jointly with WITNESS #5. These meetings were coordinated in person or via phone and usually took place after school. For a typical meeting, TAYLOR travelled from his home in Virginia to WITNESS #4's home in Maryland to pick him up in TAYLOR's car. In the car, TAYLOR would wrestle and rough house with WITNESS #4 and/or WITNESS #5, including by groping their respective genitalia. They often drove to a restaurant—sometimes in Maryland, sometimes in Washington, DC—to get a snack or meal. At the conclusion of the meal, TAYLOR would alternate dropping off either WITNESS #4 or WITNESS #5 first so he had equal alone time with each from meeting to meeting.

30. During the alone time in the car after TAYLOR dropped off WITNESS #5, TAYLOR consistently asked WITNESS #4 about sex and masturbation. TAYLOR inquired, in sum and substance, whether WITNESS #4 masturbated; if he did masturbate, how many times in the last week; what he thought about when he masturbated; and other similar topics. After discussion of these topics, TAYLOR would pray with WITNESS #4. During prayer, TAYLOR always made physical contact with WITNESS #4, sometimes with one hand on WITNESS #4's shoulder and the other on WITNESS #4's leg. On some occasions, during prayer, TAYLOR moved his hand up WITNESS #4's leg to touch his upper thigh or genitals.

31. TAYLOR encouraged WITNESS #4 to maintain a journal as part of his mentorship with TAYLOR, which WITNESS #4 retained throughout his adult life.

32. In the summer of 2000, WITNESS #4 and three other teenage boys went on a ministry trip with TAYLOR to HONDURAS. After a day on a boat excursion, WITNESS #4 fell ill with a gastrointestinal sickness. Upon their return to their hotel, TAYLOR took WITNESS #4 to his hotel room under the appearance of taking care of WITNESS #4. TAYLOR provided WITNESS #4 with unknown medication. WITNESS #4 does not recall any events of the evening or following morning, which was the day they flew back home. WITNESS #4 said he experienced pain throughout his body but could not determine whether the source was his gastrointestinal sickness or something else.

33. WITNESS #4 did not recall any other adult chaperones on the trip.[6] WITNESS #4 retained photographs from this trip and provided them to the investigators. Some of these photographs appear to have been taken by TAYLOR, as they depict only WITNESS #4 and the other boys on the trip. One such photo is included below:

[6] Some of the photographs of the trip provided by WITNESS #4 depict another adult besides TAYLOR, but the identity of this adult is unknown to WITNESS #4.



*TAYLOR's Conduct with WITNESS #5, as relayed by his parents (WITNESSES #6 and #7)*

34. WITNESS #5 was born in 1984 and participated in TFC's youth ministry program from approximately 1998 to 2002. WITNESS #5 died in 2021 as a result of substance abuse. Information about WITNESS #5's interactions with TAYLOR was provided to the investigators by WITNESS #6 (WITNESS #5's father) WITNESS #7 (WITNESS #5's mother), and WITNESS #4, who was a close friend of WITNESS #5 and, as described above, participated in mentorship sessions with TAYLOR and WITNESS #5.

35. Around 1998, TAYLOR took an interest in mentoring WITNESS #5 and arranged to conduct mentorship meetings with WITNESS #5 on occasion after school. WITNESS #7

recalled arranging such meetings via telephone and greeting TAYLOR when he came to the family's home to pick up WITNESS #5 in his car for the meeting.

36. Around 1998 or 1999, TAYLOR called WITNESS #7 to ask about taking her son, WITNESS #5, on an overnight trip. TAYLOR had a speaking engagement out of state and relayed that there would be opportunities for WITNESS #5 to meet other Christian guys and play basketball. WITNESSES #6 and #7 agreed to let TAYLOR take WITNESS #5 on the trip. WITNESSES #6 and #7 believe the trip to have been to a suburb of Chicago, Illinois.

37. As an older teenager, WITNESS #5's interest in TFC's youth ministry program waned. Shortly after the trip, WITNESS #5 began heavily consuming alcohol. As a young adult, WITNESS #5 often expressed anger toward his parents' support of and involvement with the church.

38. As an adult, WITNESS #5 continued to suffer from alcoholism. In approximately 2011, WITNESSES #6 and #7 learned of TAYLOR's sexual abuse of WITNESS #1. This made them concerned for their son, given the time he spent with TAYLOR. When they initially asked WITNESS #5 if he'd had any negative experiences with TAYLOR, WITNESS #5 shared that TAYLOR was "weird" and "talked a lot about masturbation" but did not make further disclosures.

39. As the years went on, WITNESSES #6 and #7 continued to ask WITNESSS #5 about his drinking and experiences with TAYLOR; these inquiries often made WITNESS #5 angry and agitated. On one occasion, WITNESS #5 angrily retorted to his parents "Why do you think I started drinking, mom and dad? It's because of Jeff Taylor." Another time, when his parents asked him if anything had happened with TAYLOR, WITNESS #5 exclaimed, "You put me in his hands!" and expressed distress that he did not remember more of what might have happened.

40. WITNESS #5 also asked his parents "Why did you put me alone in the car with him?" when TAYLOR would come up in conversation.

41. In the few years before his death in 2021, WITNESS #5 made additional disclosures to his parents. In sum and substance, WITNESS #5 recalled on the overnight trip with TAYLOR that he woke in the middle of the night to TAYLOR laying on top of him, "touching him," and saying "shhhh" while gesturing with his index finger over his mouth. WITNESS #5 had no further memories and believed he was drugged by TAYLOR.

*TAYLOR's Conduct with WITNESS #8*

42. WITNESS #8 was born in 1991 and participated in a ministry program led by TAYLOR in Atlanta from approximately 2003 to 2008. WITNESS #8 was part of a group of boys who participated in a weekly bible study with TAYLOR, but soon TAYLOR sought to spend one-on-one time with WITNESS #8 through mentorship meetings. For the meetings, TAYLOR picked up WITNESS #8 in his car and they went somewhere to talk.

43. During these meetings, when they were alone, TAYLOR consistently asked WITNESS #8 about sex and masturbation. TAYLOR inquired, in sum and substance, whether WITNESS #8 masturbated; if he did masturbate, how many times in the last week; what he thought about when he masturbated; and other similar topics.

44. Around the time WITNESS #8 was in approximately eighth grade, TAYLOR became more physical with him during their meetings. TAYLOR's hand lingered on WITNESS #8's leg during car rides or prayer. Eventually, TAYLOR began to rub his hand on WITNESS #8's leg and moved his hand toward WITNESS #8's genitals. TAYLOR's hand would linger on his genitals and progress to "heavy petting" of WITNESS 8's genitals. This continued meeting after

meeting, and over time, TAYLOR progressed to directly touching WITNESS #8's genitals underneath his underpants.

45. On a few instances, WITNESS #8 slept overnight at TAYLOR's home, as WITNESS #8 was friends with one of TAYLOR's children. On these instances, TAYLOR sexually abused WITNESS #8, including by initiating oral sex and anal sex.

46. After instances in the car or at TAYLOR's home, TAYLOR told WITNESS #8 that what happened was "spiritual warfare" and they needed to pray about what happened.

*Information Relayed by WITNESS #9, a Member of TAYLOR's Household*

47. WITNESS #9 was born in 1986 and is the child of TAYLOR. WITNESS #9 grew up in TAYLOR's household and resided with him from his birth until he left for college in approximately 2004.

48. From his experiences growing up around TAYLOR, WITNESS #9 knew TAYLOR to consistently keep a journal. TAYLOR used black-and-white composition notebooks and usually had two at any given time. Once the notebooks were filled, TAYLOR retained them and added them to a shelf in their home. TAYLOR utilized his journals during morning prayer time, to journal about his experiences, and to write notes on sermons. TAYLOR always had a journal with him when he left the house in the morning. To WITNESS #9's knowledge, TAYLOR took his journals with him when he met with members of the youth ministry, who he advised to keep their own journals. WITNESS #9 remembers stacks and stacks of these journals in his home throughout the years.

49. When WITNESS #9 was a child, their family had a camera and TAYLOR was typically the one who took the photos. TAYLOR took photos both of family events and youth

ministry events. WITNESS #9 recalled there were printed photos of youth ministry events and trips in his family home.

50. WITNESS #9 also recalled the family had numerous photo albums which contained photos of WITNESS #9 and his siblings as they grew up. WITNESS #9 was able to obtain some of these photographs around 2008 for a slideshow for his wedding. WITNESS #8 remembers sometime during 2004-2008, TAYLOR retrieved and showed him a photograph of TAYLOR from his earlier college swimming years. This photograph showed off TAYLOR's physique at the time and TAYLOR asked WITNESS #8, on of the boys he abused, to look at and comment upon it.

51. In WITNESS #9's experience, TAYLOR kept photographs of students he mentored through youth ministry throughout the years. Most of these were located at TAYLOR's church office, the contents of which TAYLOR moved from office to office as he changed jobs. WITNESS #9 recalled TAYLOR had in his office a photograph of a boy whom TAYLOR mentored from his early days in youth ministry at Winnetka Bible Church. When holding up the framed picture, which TAYLOR had retained for many years after working at Winnetka Bible Church, TAYLOR said things to WITNESS #9 like the boy was "a special teenager" and "good looking."

52. WITNESS #9 also recalled his family kept a big paper calendar on the wall to keep track of everyone's schedules. This calendar would include when TAYLOR was to be gone on overnight trips or retreats or ministry trips. WITNESS #9 also said TAYLOR kept his own, personal work calendars. WITNESS #9 did not know whether these calendars were retained by TAYLOR or his mother but remarked his parents were "not the type to throw things away."

53. WITNESS #9 stated TAYLOR utilized "thumb drives" "all the time" in the early 2000s. TAYLOR provided WITNESS #9 numerous forms of documents from the household on such thumb drives.

54. WITNESS #9 moved homes with TAYLOR numerous times during childhood due to changes in TAYLOR's employment. In WITNESS #9's experience, TAYLOR did not readily dispose of things. In terms of the contents of TAYLOR's church office, WITNESS #9 did not know if those contents now resided in TAYLOR's home but thought it was likely. TAYLOR employment in ministry ended in approximately 2009, after which he worked in various non-profit organizations in Georgia and Ohio. Based on open source research, the last time TAYLOR appears to be employed was April 2024.

55. Due to the allegations of TAYLOR'S sexual abuse, which WITNESS #9 believes are credible, WITNESS #9 has not had close contact with TAYLOR in recent years.

*Retention of Papers and Effects*

56. Throughout this investigation, I have interviewed individuals who retained paper calendars and/or datebooks from the 1990s, including the mothers of WITNESS #3 and WITNESS #5. I have also interviewed numerous individuals who retained photographs from the 1990s.

57. My investigation revealed at least one copy of an electronic calendar maintained by TAYLOR in November 2001, during which some of the SUBJECT OFFENSES took place, and on the calendar were numerous time allocations for the names of several known and suspected minors. There is thus probable cause to believe TAYLOR maintained an electronic calendar that will contain dates and times for meetings with minor children in his ministry who are either victims or potential victims.

58. My investigation revealed at least copy of an electronic document about TAYLOR drafted by TFC in approximately 1989 by a search committee for a new youth minister. In the document, among a list of TAYLOR's qualifications as a candidate was a note which stated, in sum and substance, that TAYLOR had a computer and wrote most of his programs and materials.

59. In my training and experience, people maintain copies of their resumes as they were at various points in time and continue to update their resumes throughout their professional life. TAYLOR changed jobs in at least 2002, 2004, 2009, 2010, 2013, 2023, and 2024. There is a reasonable likelihood TAYLOR has a copy of his resume or curriculum vitae at the PREMISES. In my training and experience, resumes or curriculums vitae may include a list of professional speeches or sermons given during one's tenure, often listing the location and date of the speech. Because TAYLOR isolated more than one minor victim on trips related to speeches or sermons to outside activities, his resume is likely to provide evidence of the times, dates, and locations of these allegations.

*Attribution to Residence*

60. WITNESS #9 provided information that TAYLOR and his wife moved to the PREMISES in approximately 2013. The mother of TAYLOR's wife already lived at the PREMISES, but TAYLOR and his wife moved in to assist her due to her advanced age.

61. A query of the Clermont County (Ohio) Auditor's website for the PREMISES indicated it was presently owned by TAYLOR's wife and had been since 2023. From 2004 to 2023, the PREMISES was owned by the person/trust of the mother of TAYLOR's wife, who died in 2023.

62. A query of Ohio Department of Motor Vehicle records identified a driver's license for TAYLOR, issued on December 28, 2023, which listed the PREMISES as his residential address. A driver's license issued for TAYLOR on April 16, 2025 again listed the PREMISES as his residential address.

*Residential Verification*

63. According to Duke Energy, as of September 4, 2026, TAYLOR is listed as the name registered to the utilities at PREMISES. Also associated to the account is the phone number known to be associated to TAYLOR.

64. On September 8, 2026, a vehicle registered to TAYLOR was observed exiting the garage of the PREMISES. Shortly afterward, TAYLOR was observed exiting the vehicle in a public parking lot.

## SPECIFICS OF SEARCH AND SEIZURE OF ELECTRONICS

65. As described above and in Attachments B, this application seek permission to search for records that might be found on the SUBJECT PREMISES in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, USB drive, and other storage media. WITNESS #9 discussed TAYLOR utilizing USB drives for storage of personal and household documents "all the time." Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

66. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

67. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on and transferred among a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro and macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, CDs, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. For a USB drive in particular, there is no means to import data onto a USB drive without that data being on a computer in some form. This may include downloading the data from another storage drive onto a computer and transferring it or downloading the data from the Internet onto the computer to transfer to a USB drive. In sum, if TAYLOR stored data and files on a USB drive, he must have utilized a computer that also contained that data to do so.

68. Based on my training and experience, people carry files forward across computer generations, often with minimal deliberation about which files are carried forward, utilizing a handful of migration tools that have become standard. When someone buys a new machine, tools like Windows' built-in "PC transfer" features, Apple's Migration Assistant, or third-party utilities

like Laplink PCmover let them move an entire user profile—documents, desktop files, application data, even settings — in one pass rather than manually picking files. Cloud sync services (such as, Microsoft OneDrive, Apple iCloud Drive, Google Drive, and Dropbox) achieve the same effect: once a folder is linked to a cloud account, its contents persist and follow the user to any new device that logs into that account, regardless of how many physical devices have been utilized since the file was added to the cloud account. Backup and restore tools like Time Machine or Windows Backup serve a similar function, letting someone "unpack" an the full contents of a prior device's file structure onto a new device.

69. Witnesses and open source data confirm that TAYLOR had an email account during the temporal timeframe sought in ATTACHMENT B. Further records indicated TAYLOR had a Google account since 2009 which subscribed to Google Drive.

70. Because these migration tools are designed to minimize friction and avoid making users choose what to keep, the path of least resistance is to carry forward all files. A stray document from a decade-old computer often survives not because anyone deliberately preserved it, but because it got swept into a full profile migration or synced folder at some point and was never actively deleted afterward. Thus, there is a high probability that an electronic device utilized in 2026 will contain files with creation dates years or decades prior.

71. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data on site for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and

specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is

opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

*Search Protocol*

72. The nature of the materials sought—papers, calendars, photographs—is likely to require analysis of a large volume of materials. Analyzing every piece of paper and photograph to determine whether it falls within the scope of ATTACHMENT B makes it impractical to execute the entirety of the search at the PREMISES. The investigation has revealed, and WITNESS #9 corroborates, that TAYLOR's wife suffers significant physical ailments and is heavily medicated. A full scope search analyzing each paper within the household at the household could take several days, which would be unduly intrusive for her and could risk officer safety. For this reason, Attachment B specifies a search protocol under which papers and photographs will be reviewed off site and returned to the premises within seven days.

## **CONCLUSION**

73. Based upon the above information, I respectfully submit there is probable cause to search the PREMISES described in Attachments A and to seize the items described in Attachment B.

Respectfully submitted,

Jacqueline W. Scott

Jacqueline Scott
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by reliable electronic means, specifically, FaceTime video conference, in accordance with the requirements of Fed. R. Crim. P. 4.1, on September 10, 2026.

Stephanie K. Bowman

Stephanie K. Bowman
United States Magistrate Judge

# ATTACHMENT A

## Property to Be Searched

The property to be searched is 214 Miami Lakes Drive, Milford, Ohio 45150 (the "PREMISES.") The PREMISES is an approximately 1,841 square feet condominium with 2 bedrooms and 2 bathrooms. The PREMISES is the end unit of a row of 5 condominiums with "214" affixed to the front of the 2-car garage. The following images were obtained through the property search function of the Clermont County (Ohio) Auditor's website[1].



Photo source: Website of the Clermont County Auditor[2], date 11/09/2018

[1] https://www.clermontauditorrealestate.org/_web/search/commonsearch.aspx?mode=owner
[2] https://www.clermontauditorrealestate.org/_web/idoc2/photoview.aspx?sIndex=0&idx=1&LMparent=944



Photo source: Website of the Clermont County Auditor[3], Date 03/19/2024

[3] https://www.clermontauditorrealestate.org/_web/maps/cyclomedia.aspx?sIndex=0&idx=1&LMparent=944




Photo source: Website of the Clermont County Auditor [4], date 03/19/2026

[4] https://www.clermontauditorrealestate.org/_web/pictometry/pictometryipa.aspx?sIndex=0&idx=1&LMparent=944

# ATTACHMENT B

## Property to Be Seized

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, relating to violations of 18 U.S.C. § 2422(b) (Coercion and Enticement and Attempted Coercion and Enticement) and 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct), occurring between 1990 and 2008 (the "TARGET OFFENSES"), that have been committed by JEFFREY TURNER TAYLOR (the "SUBJECT") as described in the search warrant affidavit, including, but not limited to:

a. Evidence of the TARGET OFFENSES;

b. Communications between SUBJECT and minors (other than his children), in particular, minors to whom SUBJECT discipled, ministered to, and mentored between 1990 and 2008;

c. Evidence of any planning or preparation to commit those offenses;

d. Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

e. Evidence of the state of mind of SUBJECT, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

2. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of potential victims and witnesses of violations of the TARGET OFFENSES.

3. The passport of the SUBJECT.

4. Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES.

5. Mementos of the TARGET OFFENSES, including but not limited to minor boys' underwear and underwear waistbands; mementos, souvenirs, and keepsakes from travel with children, mission trips, and church retreats.

6. Records and information—including but not limited to photographs, calendars, journals, itineraries, receipts, and financial statements—relating to the SUBJECT's coercion and enticement of minors and/or travel with the intent to engage in illicit sexual conduct with minors. This includes but is not limited to:

a. Photographs, in particular photographs of minor boys not his children, photographs of SUBJECT with minor boys not his children, and photographs the SUBJECT showed to victims as described in the affidavit;

b. Photographs of mission trips, church retreats, and day or overnight trips the SUBJECT traveled to between 1990-2008;

c. Journals or diaries maintained by the SUBJECT between 1990-2008;

d. Calendars, electronic calendars, or datebooks maintained by the SUBJECT and/or concerning the SUBJECT's whereabouts and daily meetings between approximately 1990 and 2008;

e. The professional resume or curriculum vitae of the SUBJECT showing professional entries from 1990 until 2008;

f. Electronic removable media which may contain materials sought in this paragraph, including electronic copies of itineraries, receipts, financial statements, photographs and/or videos contained on storage media such as VHSs, CDs, DVDs, Floppy Discs, USB Drives, and external hard drives;

g. Computers that may be used as a means to store the materials described above.

7. For any computer and/or storage medium whose seizure is otherwise authorized by this warrant, and any computer and/or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e. evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

8. This warrant authorizes temporary seizure of all papers, documents, photographs, electronic removable media at the PREMISES for further review at Federal Bureau of Investigation Field Office(s). Government personnel assisting in the investigation will promptly review these materials for assessment of seizure pursuant to ATTACHMENT B. All materials not responsive and included in ATTACHMENT B will be returned to the PREMISES within 7 calendar days.

9. Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices, within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a

complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

10. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the investigation.

11. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

12. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

13. If the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e. communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. This investigation is presently covert and the government believes that the subject of the search is not aware of this warrant.